IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FRED E. MCGREW, JR.,                    )
                                        )
            Plaintiff,                  )
                                        )        No. 07 C 3397
      v.                                )
                                        )        Magistrate Judge
MICHAEL J. ASTRUE,                      )        Maria Valdez
Commissioner of Social Security,        )
                                        )
            Defendant.                  )
                                        )

## MEMORANDUM OPINION AND ORDER

This is an action brought under 42 U.S.C. § 405(g) to review the final decision
of the Commissioner of Social Security denying Plaintiff Fred E. McGrew, Jr.'s
claim for Disability Insurance Benefits and Supplemental Security Income. The
parties have consented to the jurisdiction of the United States Magistrate Judge
pursuant to 28 U.S.C. § 636(c). For the reasons that follow, McGrew's Motion for
Summary Judgment or Remand [Doc. No. 18] is granted in part and denied in part,
the Commissioner's Motion for Summary Judgment [Doc. No. 27] is denied, and the
matter is remanded to the Commissioner for further proceedings consistent with
this order.

## I. PROCEDURAL HISTORY

McGrew initially applied for Disability Insurance Benefits ("DIB") and
Supplementary Security Income ("SSI") on June 13, 2003, alleging disability since
August 13, 2002. (R. 103-05.) The application was denied on September 3, 2003 and

upon reconsideration on October 16, 2003. (R. 35-38, 40-42.) McGrew filed a request for a hearing by an Administrative Law Judge ("ALJ") on March 4, 2004, with good cause for late filing as a result of McGrew being sent the wrong forms. (R. 46, 248-50.) The hearing was held on April 19, 2006, where McGrew, represented by counsel, appeared and testified before the ALJ. (R. 239.) A vocational expert also testified at the hearing. (R. 313-34.)

On September 7, 2006, the ALJ determined that McGrew was not disabled and therefore denied his applications for DIB and SSI. (R. 11-31.) McGrew filed for a timely Request for Review of the unfavorable decision on October 6, 2006. (R. 7.) Counsel for McGrew submitted a brief in support of the Request for Review on February 22, 2007. (R. 235-38.) The Request for Review was denied by the Appeals Council on April 13,2007, leaving the ALJ's decision as the final decision of the Commissioner and therefore reviewable by the District Court under 42 U.S.C. § 405(g). (R. 3-5.) Plaintiff filed this action seeking judicial review on June 15, 2007.

## II. FACTUAL BACKGROUND

### a. Background

McGrew was born on May 25, 1959. (R. 103.) At the time of the hearing he was forty-six years old. (R. 264.) He is six feet two inches tall and weighs 250 pounds. (R. 117.) He completed one year of college and six months of welding school. (R. 268-69.) McGrew is married with five children, three from a previous marriage; he now lives with his current wife and her two children. (R. 103, 265.) McGrew claims disability beginning August 13, 2002 because of asthma, mild obesity,

hypertension, stab wounds, and severe pain in the lower back and groin. (R. 103, 117.)

      b.    <u>Testimony and Medical Evidence</u>

          *1.    McGrew's Testimony*

McGrew testified that in the past, he had worked as an auto detailer, as an auto painter, repairing lawn mowers, and cutting sheet metal. (R. 279, 282-84.) After suffering stab wounds in 1992, he applied for disability benefits but was denied in 1993. (R. 11, 284.) He filed another application in 1995 and was found disabled, but the benefits were cut off in 2000 after it was discovered that he had engaged in substantial gainful activity during 1999. (R. 11, 252.)

He worked at Murray's Auto Parts from 1999 to 2000, and in July 2001, McGrew began working at his last job, as a parts sales manager at AutoZone. (R. 257-58, 271, 276.) His duties were to sell parts, supervise four employees, ensure that inventory was ordered, accept and stock deliveries, and open and close the store. (R. 271-72.) He had to lift thirty- to forty-pound items off of shelves in order to sell them to customers. (R. 272.) He injured his back in February 2002 on a day where he had to perform an unusually large amount of lifting. (R. 257-58, 273.) After he returned to work in June 2002, he could perform only light work because he had difficulty lifting; in order to accommodate his lighter duty requirement he had to transfer to another store. (R. 273.) McGrew claims that during this second period of working at AutoZone, his social security number was entered incorrectly, and his earnings record fails to reflect his employment accurately. (R. 253.)

At the new store, McGrew had different responsibilities, doing primarily paperwork, and the managers would let him sleep because they had nothing for him to do. (R. 274-75.) In September 2002, he called into work and reported to a non-managerial worker that he would be unable to come in because he could not move. (R. 275.) When McGrew returned to work the following day, his boss terminated him for failing to call in sick. (*Id.*) After his termination, McGrew received unemployment for six months. (R. 268.) He has not worked since his position at AutoZone and claims he has been largely incapacitated due to his back pain. (R. 276.)

McGrew testified that his pain is up and down and that he is sometimes more able to move than at other times, but he typically cannot get out of bed as many as three or four days a week. (R. 298, 301.) He testified that the pain starts in his back and then "goes around" to the groin, and nothing seems to either bring on the pain or make it worse. (R. 301-02.) Pain from muscle spasms in his back has caused him to feel ill. (R. 308.) McGrew stated that 800mg of Motrin works best to control his pain, and he uses an inhaler when he has trouble breathing. (R. 302.) Most of the time, he wakes, gets something to eat, takes his pain pills, and falls back asleep. (R. 298.) He claimed that his pain makes it difficult to help out around the house or go grocery shopping, and it has also made him unable to enjoy many of his former hobbies other than watching television. (R. 299-301.) He could not bend over and lift a case of pop if it were on the floor, but he could lift a gallon of milk if he was seated and it was sitting on the table, but not if he was standing. (R. 303-04.) McGrew

stated that he could stand for about thirty minutes if he was leaning on something, and he cannot walk distances of more than half a block without stopping. (R. 304, 309.) He claimed his hands swell and cramp every day as a result of arthritis and that it is difficult for him to use knives or kitchen appliances; he takes arthritis Advil to alleviate the cramping and swelling. (R. 305-06, 310.)

### 2. Medical Evidence

McGrew's medical history is not in dispute and was extensively summarized in the ALJ's decision. Following his February 2002 back injury, McGrew saw Dr. Scott Hanlon at the Evergreen Medical Clinic on March 1, 2002 and was diagnosed with cervical radiculopothy and a herniated lumbar disc, for which he was prescribed Naprosyn, an anti-inflammatory drug. (R. 17, 211-12.) McGrew returned to Evergreen on March 5, 2002 and saw Dr. John Elsen, complaining that Naprosyn was not helping his pain but stating that he did experience partial relief with Tylenol #3, which he already had at his home. (R. 17, 208.) Dr. Elsen observed tenderness in the right and central lumbar regions with poor flexibility of his lumbar spine, muscle spasm, and palpable tenderness in the proximal right trapezius. (R. 208.) McGrew was not able to perform the straight leg test or other tests because he was not able to sit or lay down on the exam table, nor was he able to stand on his toes or heels due to pain. (*Id.*) Dr. Elsen prescribed Medrol Dosepack, Vicodin and Soma for pain. (*Id.*)

A March 12, 2002, MRI ordered by Dr. Elsen showed disc desiccation at the L5-S1 level with diffuse bulging. (R. 150.) On April 1, 2002, McGrew saw Dr.

5

Hanlon again, to review the MRI results. (R. 204.) At this visit, McGrew reported groin and back pain radiating to his left arm and leg, which was somewhat relieved with medication. (R. 18, 204.) A cervical MRI was performed on April 6, 2002, and showed multilevel degenerative changes throughout the cervical spine from C2 to C7, most severe at the C5-6 levels. (R. 18, 149.)

On April 18, 2002, McGrew saw Dr. George Miz for complaints of right upper extremity parasthesia as well as low back and right leg pain. (R. 18, 166.) McGrew advised Dr. Miz that his neck pain was "for the most part resolved" but that he had general weakness of his right arm and paresthesias into his right thumb and index finger. (R. 18, 166.) McGrew also reported "quite severe" low back pain that caused difficulty with walking, sitting, and standing for prolonged periods of time. (R. 166.) McGrew claimed his pain was so severe that he was unable to work. (Id.) Dr. Miz observed that McGrew's cervical and lumbar MRIs showed multi-level spondylosis with a mild to moderate multi-level spinal stenosis and also marked disc degeneration with foraminal narrowing and facet arthropathy at L5-S1. (Id.) Dr. Miz's impression was that McGrew had cervical radiculitis and lumbar radiculopathy. (Id.) Dr. Miz recommended physical therapy ("PT") and noted that if McGrew failed to respond to the treatment, he might be a candidate for further pain management treatment. (Id.)

On April 22, 2002, McGrew had a follow-up appointment with Dr. Hanlon in order to discuss his course of treatment. (R. 200). McGrew stated that his low back pain was improved with Vicodin, and he did not believe that PT would be beneficial

6

to him. (*Id.*) Dr. Hanlon prescribed Bextra in addition to the existing prescription for Vicodin. (*Id.*)

On May 7, 2002, McGrew had an initial PT evaluation at Little Company of Mary Hospital. (R. 19, 215.) The therapist noted that McGrew's subjective complaints were not consistent with his objective examination and observations. (R. 215.) During May 2002, McGrew went to a few PT appointments but attended only half of the recommended sessions, stating that it was too painful for him to get to the remaining sessions. (R. 167.) At the sessions, McGrew reported his pain was a ten out of ten and claimed that PT did not significantly reduce these levels. (R. 215-18.) The physical therapist ultimately reported to Dr. Miz that there was no change in McGrew's progress through PT. (R. 218.)

McGrew followed up on June 6, 2002 with Dr. Miz, who reported that McGrew continued to complain of severe lower back pain with radiation to his groin and down his right leg. (R. 167.) McGrew told Dr. Miz that he had received no benefit from PT. (*Id.*) Dr. Miz found a moderately positive straight leg raising test on the right for reproduction of back pain and noted no new neurological deficits (*Id.*) Dr. Miz referred McGrew to Dr. Glaser for pain management options such as epidural or transforaminal blocks. (*Id.*) Dr. Miz also restricted McGrew to a sedentary-only position with allowance for sitting and standing as needed. (*Id.*)

There is no record that McGrew sought any pain management treatment from Dr. Glaser.[1] (R. 19.)

After McGrew filed for DIB, the Agency referred him to Dr. Angelito A. Bernardo, who saw McGrew on August 9, 2003. (R. 155.) McGrew complained to Dr. Bernardo of back pain, asthma, high blood pressure, and stab wounds. (*Id.*) Dr. Bernardo noted that McGrew was obese, walked slowly while holding his back, hyperventilated with diminished air entry and wheezing on expiration, had tenderness in his lumbosacral region and decreased range of motion in his lumbar spine, reduced ability to squat, and tested positive on the straight leg test on the right. (R. 156-59.) Dr. Bernardo's dexterity examination showed that McGrew was able to make a full fist bilaterally, with 5/5 grip bilaterally, and that his dexterity was intact for fine and gross movements. (R. 158.) Dr. Bernardo found McGrew's mental status to be normal, without signs of depressive disorder. (*Id.*)

On August 27, 2003, McGrew went to the emergency room ("ER") at Stroger Hospital complaining of trouble breathing due to his asthma and increased back pain. (R. 168-69.) He was given prescriptions for inhalers, Voltaren (an NSAID), and extra strength Tylenol, and he was referred to a clinic. (R. 169.) There is no record that he followed up with the referral. (R. 20.)

---

[1] Dr. Miz's notes suggest that McGrew had appointments scheduled with Dr. Miz on June 28, 2005 and July 5, 2005, but he was not seen on either day. (R. 213.) There is no record of any visits to Dr. Miz after June 6, 2002.

A year later, on August 20, 2004, McGrew was seen at Provident Hospital's ER due to blurry vision and eye and back pain; he was prescribed an antibiotic ointment and Motrin for the eye pain and was told to follow up with the Sengstacke eye clinic, which he apparently did not do. (R. 20, 187-91.) He was also given prescriptions for asthma medication and Robaxin, a muscle relaxant. (R. 187-91.)

On December 22, 2005, McGrew returned to the Provident ER for back pain and asthma and was given prescription refills. (R. 193-97.) During this visit, an x-ray showed minimal anterior degenerative spondylosis, with no evidence of a compression fracture or malalignment. (R. 198.) McGrew was referred to the Sengstacke orthopedic clinic for follow-up on his back pain. (R. 195.)

McGrew went to the Sengstacke orthopedic clinic on March 9, 2006, complaining of weakness and numbness in his right leg. (R. 20, 232.) An examination revealed a tender back, moderately reduced range of motion for bending forward and backward, and severely reduced range of motion for bending to the sides. (*Id.*) The straight leg raising test was negative bilaterally; McGrew also had reduced strength in his legs and absent symmetric reflexes. (*Id.*) The doctor's assessment considered that McGrew might have lumbar radiculopathy or a nerve injury, and he ordered nerve conduction studies and a lumbar x-ray, with a follow-up in six weeks. (*Id.*) McGrew underwent the electromyographic test ("EMG") on March 16, 2006, but despite multiple attempts to modify the test, McGrew could not tolerate the nerve stimulation studies or needle EMG, and the test was ended before data could be collected. (R. 233.)

On April 18, 2006, the day before the ALJ hearing, McGrew saw Dr. Chao T. Chen, who examined McGrew and completed a Residual Functional Capacity ("RFC") assessment. (R. 226-30.) Dr. Chen concluded that McGrew suffers from lower back pain with radiation to his groin and asthma. (R. 226.) Dr. Chen also noted a number of emotional factors he believed affected the severity of McGrew's symptoms, including depression, anxiety, somatoform disorder, and personality disorder. (*Id.*) Dr. Chen concluded that McGrew was not a malingerer. (*Id.*)

Dr. Chen's report had findings of a positive straight leg raising test and tenderness of the lumbar spine. (*Id.*) Dr. Chen wrote that McGrew "can't work" and "can't walk long"; Motrin makes him "sleepy"; his pain would "constantly" be severe enough to interfere with his attention and concentration; and he has significant limitations with reaching, handing, and fingering. (R. 226-29.) Dr. Chen prescribed inhalers and 800 mg Motrin. (R. 230.)

Two agency physicians reviewed Plaintiff's records in August and October 2003 and completed RFC assessments. (R. 170-185.) Both reviewers agreed that McGrew could lift ten pounds occasionally and less than ten pounds frequently; could stand and/or walk for at least two hours in an eight-hour work day; could sit for about six hours in an eight-hour workday; had an unlimited ability to push/pull; was limited to stair climbing, balancing, stooping, kneeling, and crouching only occasionally, and never climbing ladders/ropes/scaffolds; had no manipulative, visual, or communicative limitations; and should avoid concentrated exposure to fumes and odors. (R. 170-85.)

10

Under questioning by the ALJ, McGrew testified that he had not been treated anywhere except Provident and Stroger Hospitals because he could not afford to go anywhere else. (R. 246.) He did not have any health insurance since he lost his job in 2002, and his wife could not afford to put him on her insurance. (R. 242, 244.) He claims that doctors have refused to fill out paperwork in support of his applications for welfare benefits to get a medical card. (R. 24.) McGrew stated that he could not afford the fifteen-dollar fee required for treatment at the Board of Health. (*Id.*) McGrew's siblings have occasionally purchased prescription-strength pain medication "on the street" for him a few times, but he testified that his family will not help him pay for visits to the Board of Health. (R. 24.) His brother did, however, give him the $60 needed for the visit to Dr. Chen the day before the hearing. (*Id.*)

### 3. *Vocational Expert's Testimony*

Grace Gianforte testified as the vocational expert ("VE"). (R. 313.) The VE testified that McGrew's past relevant work was mostly semi-skilled and medium, except for his work at AutoZone, which was heavy. (R. 317.) The VE testified that McGrew had acquired skills that would be transferrable to light and sedentary occupations. (*Id.*) The VE testified that McGrew's skills would transfer to jobs such as auto damage appraising, auto service writer, auto specialty service technician, retail sales cashier, and inspector and tester at the light level; and order clerk, material recording and scheduling clerk, and inspector/checker/examiner/ testers and wearers at the sedentary level. (R. 318.)

The ALJ asked the VE whether any unskilled sedentary jobs exist in the region for a hypothetical individual who had the following limitations: could not use his lower extremities for constant pushing or pulling against resistance; could not climb ladders, ropes or scaffolds; could only occasionally climb ramps or stairs, stoop, knee, crouch or crawl; and could not work at unprotected heights, extremes of temperature, humidity, or in the presence of concentrated respiratory irritants. (R. 317-19.) The VE concluded that the individual could perform jobs as a security clerk/surveillance monitor (2500 jobs), data examination clerk, material recording and/or scheduling clerk (4000 jobs) or an order clerk (12,000 jobs). (R. 319.) The VE stated that 90% of sedentary jobs, including those listed, require either constant or frequent use of hands for fingering or handling. (R. 327.) All of the positions have an SVP rating of two or three and are considered simple, repetitive unskilled work that do not require significant exercise of independent judgment or decisionmaking and have predictable tasks. (R. 29, 317-19.)

The ALJ asked the VE whether employers typically expect the worker to be on task and productive 100% of the workday. (R. 323.) The VE responded that employers typically expect workers to be productive about 80% of the time, or fifty minutes of every hour. (*Id.*) The VE added that a person frequently off task, for whatever reason, would not be an appropriate candidate for competitive work. (*Id.*) When McGrew's attorney questioned the VE about how many days off an employer would allow a worker to take per month, the VE responded that in the private sector an employer would allow 1.3 days off and in the public sector 1.8 days. (R.

326.) The attorney then asked how the need to take a half-hour to one hour break to lay down would affect the worker's ability to remain employed; the VE responded that such a break would have a substantial effect on the worker's employability if it were taken outside of the allotted mid-shift break. (R. 327-28.) Finally, the VE testified that employers have little to no tolerance for employees who take frequent unscheduled breaks or fall asleep on the job. (R. 333-34.)

c.    ALJ Decision

In determining that McGrew was not disabled, the ALJ found at Step 1 that he had not engaged in any substantial gainful activity during the relevant time period. (R. 14) At Step 2, the ALJ found McGrew suffers from severe impairments of back pain and asthma and/or COPD. (*Id.*) The ALJ, however, found no severe impairment related to any limitations with upper extremities or mental/emotional problems. (*Id.*) The ALJ further concluded at Step 3 that none of McGrew's impairments, alone or in combination, met or equaled the criterial of any section of the Listing of Impairments. (R. 15-17.)

The ALJ found that there is relatively limited objective medical evidence that McGrew suffers from physical or mental impairments that would impose disabling symptoms or functional limitations. (R. 25.) The ALJ also found that several factors undercut McGrew's credibility with regard to his claims of disabling pain and other limitations. (R. 26.) The ALJ concluded that McGrew's history of back injury and reports of pain, coupled with his moderate obesity, limit him to a wide range of sedentary work with the following RFC: lifting no more than ten pounds; standing

13

and/or walking for at least two hours in a workday; with limitations that he could not perform repetitive pushing or pulling against resistance with his lower extremities, nor could he climb ropes, ladders, or scaffolds, or have any exposure to extremes of temperature, humidity, concentrated respiratory irritants, unprotected heights or unguarded hazardous equipment. (*Id.*) The ALJ also found that the record fails to establish that McGrew is significantly limited in the ability to use either hand or arm for fine or gross manipulation of objects. (*Id.*) She concluded that McGrew's symptoms are relieved when he seeks treatment and takes prescribed pain medication, and even with over-the-counter medications, his pain would be sufficiently controlled that he would only rarely be off task or unproductive outside of scheduled break times. Finally, the ALJ found that McGrew has the mental RFC to perform and sustain at least unskilled work. (*Id.*)

Based upon her RFC evaluation, the ALJ found at Step 4 that McGrew lacks the RFC to perform and sustain his past relevant work. (R. 28.) However, at Step 5, the ALJ concluded that, considering McGrew's age, educational background, work experience, and physical and mental RFC, he is capable of making a successful adjustment to work that exists in significant numbers in the regional economy. (R. 30.) Therefore, the ALJ ruled that McGrew was not disabled at any relevant time through the date of her decision. (R. 30.)

## III.   DISCUSSION

### a.   ALJ Legal Standard

Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a).  In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently disabled? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? 20 C.F.R. § 416.920(a)(4) (2010).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id*. The claimant bears the burden of proof at steps 1-4. *Id*. Once the claimant shows an inability to perform past work, the burden shifts to the Commissioner to show the ability to engage in other work existing in significant numbers in the national economy. *Id*.

b.  Judicial Review

Section 405(g) provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).  Judicial review of the decision of the ALJ is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon legal error. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 289, 401 (1971; *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence or deciding questions of credibility. *Skinner*, 478 F. 3d 841.

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872.  That is, the ALJ is required to give enough detail and clarity to permit meaningful appellate review. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). Where conflicting evidence could create differing inferences between reasonable minds, a determination of disability lies with the Commissioner, not with this court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 2005). The ALJ is required to consider

all relevant evidence, not only that which favors his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

    c.    <u>Analysis</u>

McGrew argues that the ALJ's decision: (1) improperly evaluated McGrew's credibility; (2) failed to incorporate all of McGrew's medical limitations into her RFC evaluation; (3) failed to fairly and fully develop the record; and (4) made an erroneous step five decision.

    *1.*    *Credibility*

McGrew asserts that the ALJ's credibility determination failed to follow the requirements of SSR 96-7p and 20 C.F.R. § 404.1529 because the ALJ's conclusion was erroneously based on objective factors rather than subjective considerations. The Commissioner responds that the ALJ's credibility determination was reasonable.

An ALJ's credibility determination is granted substantial deference by a reviewing court unless it is "patently wrong" and not supported by the record. *See Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *see also Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quoting *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006)) ("'Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed.'"). However, an ALJ must give specific reasons for discrediting a claimant's testimony, and "[t]hose reasons must be supported by record evidence and must be 'sufficiently specific to

make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Lopez* ex rel. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (quoting *Zurawski*, 245 F.3d at 887-88).

In assessing the credibility of an individual's statements about pain or other symptoms and their functional effects, an ALJ must consider all of the evidence in the case record. *See* SSR 96-7p.[2] In instances where the individual attends an administrative proceeding conducted by the adjudicator, the adjudicator may also consider his or her own observations of the individual as part of the overall evaluation of the credibility of the individual's statements. *Id*.

The ALJ concluded that a number of factors adversely affected Plaintiff's credibility as to the degree and intensity of his pain and other limitations. After first noting the importance of a claimant's credibility where there is limited medical evidence supporting Plaintiff's claims of disabling pain, the ALJ explained that Plaintiff's credibility was undermined because the original injury was relatively minor; Plaintiff returned to work with a brief period of lighter duty; Plaintiff failed to seek much treatment for his back pain; and Plaintiff's work history includes unreported income and a period of working under a social security number that was not his. The ALJ did not indicate that any one factor was dispositive by itself.

---

[2] Interpretive rules, such as Social Security Regulations ("SSR"), do not have force of law but are binding on all components of the Agency. 20 C.F.R. § 402.35(b)(1); *accord Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

Plaintiff contends that the ALJ's credibility determination erroneously relied on objective factors rather than subjective considerations. First, the Court notes that most of the errors asserted by Plaintiff, while discussed in the decision, were not listed as factors in the ALJ's ultimate credibility finding. Second, the Court is not persuaded by Plaintiff's contention that the ALJ improperly evaluated Plaintiff's failure to seek treatment for his pain. An ALJ may consider a claimant's infrequent treatment in support of an adverse credibility finding. *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008); *see also* SSR 96-7p (explaining that the credibility determination may consider whether the level or frequency of treatment is inconsistent with the level of complaints). Moreover, while the ALJ may not draw any adverse inferences from a lack of care without considering the claimant's explanations for the failure, *see Craft*, 539 F.3d 679, the ALJ did not do so in this case.

The ALJ discussed in detail the reasons she found the lack of treatment to be notable, particularly in light of Plaintiff's claim that his pain left him bedridden several days a week. Plaintiff alleges that he lacked the ability to pay for treatment, but the record indicated that Plaintiff was familiar with (and indeed occasionally took advantage of) resources available to the uninsured. Moreover, Plaintiff's argument that he could not even afford the minimal co-pay or bus fare to Board of Health clinics was found not to be credible due to his family's willingness to give him funds to pay for prescription Motrin on the street and to see Dr. Chen the day before the hearing.

Next, Plaintiff disputes the ALJ's consideration of his work history in her credibility determination. Plaintiff argues that the ALJ improperly focused on a minor flaw and that he never knowingly failed to pay taxes. The ALJ's decision, however, thoroughly lays out the reasons for her credibility conclusion, which is not exclusively based upon Plaintiff's alleged failure to pay taxes. Among other things, the ALJ did not find credible Plaintiff's testimony that he was assigned the wrong social security number due to AutoZone's error, given that the number used was his father's former small business tax identification number. Moreover, the ALJ expressly offered Plaintiff the opportunity to clarify the issue after the hearing, but he did not do so. The Court therefore finds that the ALJ's overall credibility finding included sufficiently specific and logical reasons to support her conclusion.

2.     *Medical Limitations*[3]

McGrew complains that the ALJ failed to incorporate a number of his limitations into the RFC finding. First, McGrew argues that the ALJ made a "results-oriented" decision when she implicitly concluded that he would not be off task for more than ten minutes per hour despite his pain and other impairments. The Commissioner responds that there is no objective evidence in the record showing that McGrew would be off task for such a duration that he could not be employed. McGrew's motion does not specify which symptoms would take him off

---

[3] Part of Plaintiff's argument that the ALJ erred in her Step 5 decision is functionally the same as his argument that the ALJ failed to incorporate all of Plaintiff's limitations into her RFC evaluation. All of Plaintiff's arguments related to his functional limitations will discussed in this section.

task, but based on the record as a whole, it appears that he means his pain and sleepiness would cause him to be unproductive for at least portions of every day. Because the main evidence of McGrew's pain and sleepiness is his own testimony, the ALJ's failure to consider these limitations in the RFC is inherently tied into her credibility analysis. Although, as discussed above, the Court did not find any basis to disturb the ALJ's overall credibility finding, it does not follow that the credibility-based RFC finding must necessarily be upheld. The ALJ's credibility determination focused on the evidence (or lack thereof) of McGrew's allegations of intense, disabling pain. The ALJ did not conclude that McGrew suffered no pain at all, and the objective evidence in the record could support a diagnosis of some level of pain.

The Court therefore remands the case to the Commissioner so that the ALJ may articulate more specifically the level of pain McGrew experienced and whether that pain would keep him off task more than ten minutes of every hour. This determination is of critical importance, because the VE's testimony indicated that there are no jobs available for a hypothetical worker who could not remain on task for that period of time.

McGrew next disputes the ALJ's failure to include a sit/stand limitation in the RFC, given that such a limitation was in Dr. Miz's report. The Commissioner contends that any such limitations were effectively dealt with by the ALJ's sedentary RFC finding. McGrew disagrees that the sedentary RFC incorporates a sit/stand limitation and also argues that if such a limitation is included in an RFC, the ALJ must specify how long the claimant is able to maintain each position.

McGrew's insistence on incorporating Dr. Miz's 2002 sit/stand limitation, however, is belied by his own testimony. McGrew did not claim he had any limitations on sitting, as long as he had pain medication. (R. 305.) Furthermore, unlike the "off task" limitation discussed above, a sit/stand limitation would not preclude the existence of jobs McGrew could perform; the VE's testimony indicated that in certain of the described jobs, a person could alternate sitting and standing at a bench. (R. 322.)

Third, McGrew disagrees with the ALJ's reliance on Dr. Miz's use of the term "sedentary" in his report, arguing that the report was not consistent with the term as it is used by the Commissioner. McGrew states that, at the very least, the ALJ should have contacted Dr. Miz to determine what he meant by the term. The Court finds that the ALJ's sedentary RFC was not based solely on Dr. Miz's use of the term but also considered the objective findings in Dr. Miz's report as well as the opinions of two DDS physicians who are familiar with the Agency's use of the term "sedentary" and concluded that McGrew was able to perform most sedentary work.

The Court also notes the Commissioner's argument that, after Dr. Miz issued his report, McGrew returned to work at AutoZone, where he was actually performing work at the sedentary level. McGrew's continued employment after his February 2002 injury was not dispositive to the ALJ, but it was considered as further evidence that McGrew could perform sedentary work. The fact that one has worked does not preclude a finding of disability. *See Hawkins v. First Union Corp. Long-Term Disab. Plan*, 326 F.3d 914, 918 (7th Cir. 2003) ("A desperate person

might force himself to work despite an illness that everyone agreed was totally disabling."). But although McGrew has stated that he would occasionally (and was allowed to) sleep on the job, and that he took at least one day off due to pain, the record does not reflect any allegation by McGrew that working from June to September 2002 required a Herculean effort on his part.

Fourth, McGrew argues that the ALJ improperly discounted the report of Dr. Chen, who reported limitations on reaching, handling, and fingering, and that these limitations are consistent with Dr. Miz's findings. Discrediting Dr. Chen's conclusion was important, because according to the VE's testimony, an inability to handle and manipulate would be critical to performing nearly all sedentary jobs. The Commissioner responds that the "yes" checkmark on Dr. Chen's report was unaccompanied by any notations describing the basis for his conclusion; and it was inconsistent with Dr. Bernardo's examination, which found that McGrew was able to make a fist, had normal grip strength and dexterity that would allow him to engage in fine and gross movements.

The Court finds that the ALJ did give specific reasons why she did not give full credit to Dr. Chen's opinion: he had only one visit with McGrew, he did not have access to diagnostic studies or reports, and the bases for his conclusions were not specified in his report. The ALJ therefore adequately supported her conclusion, which will not be disturbed by the Court.

McGrew next complains that the ALJ improperly disregarded the objective medical evidence of his 2002 MRI examinations. The Commissioner responds that

23

the examinations, which were performed in March and April 2002, predated the alleged onset of disability date of August 13, 2002, and McGrew was employed from June to September 2002. Moreover, Dr. Miz, McGrew's treating physician at the relevant time, concluded that his neck pain was mostly resolved two weeks after the injury. Finally, an x-ray performed in December 2005 did not support a finding that he was disabled.

An ALJ is not required to describe in detail the level of weight assigned to every single piece of evidence in the record. The Court finds that the ALJ adequately considered the 2002 MRIs in the context of the entire medical record. Similarly, McGrew's complaint that the effects of his obesity were not sufficiently considered is unpersuasive, as the ALJ expressly referred to Plaintiff's obesity in making her RFC conclusion.

4.    *Development of the Record*

McGrew also contends that the ALJ failed to fairly and fully develop the record by refusing to authorize a psychological evaluation to determine his limitations due to pain and depression or to obtain a medical expert. Plaintiff has provided no support for the contention that the ALJ has an affirmative duty to authorize a psychological evaluation at the mere mention of Plaintiff's reported anxiety and depression by a treating physician. The claimant bears the burden of providing medical evidence of a mental impairment. *Howell v. Sullivan*, 950 F.2d 343, 348 (7th Cir. 1991). Consultative examinations are not required unless they are necessary for the ALJ to make a disability determination. *Id.* Additionally, the

medical record must document pervasive symptoms of depression over at least twelve consecutive months. 20 C.F.R. § 404 app. 1 Listing 12.04. The ALJ found, based upon the whole record, that there was no evidence that McGrew suffered from a severe mental impairment and therefore declined to order an evaluation. The Court finds adequate support for the ALJ's conclusion (including Plaintiff's own testimony that he neither thought he should nor was he ever instructed to go see a psychiatrist, (R. 295)) and will not disturb it.

     5.     *Step Five Decision*[4]

McGrew contends that the ALJ committed legal error by failing to ask the VE if her testimony was consistent with the Dictionary of Occupational Titles ("DOT"). The Commissioner responds that the VE's use of terms like "SVP-1, 2, and 3" during her testimony implied that she used the DOT as the basis for her opinion. The Court finds no error, as the VE used DOT titles for the referenced jobs, and "[i]t would be redundant to force the ALJ to ask a VE if job information drawn from the DOT was consistent with the same DOT." *Demarco v. Astrue*, No. 09 C 049, 2011 WL 1002873, at * 27 (N.D. Ill. Mar. 17, 2011). In any event, Plaintiff cites to no

---

[4] In this section, Plaintiff also argues that the ALJ failed to properly investigate a discrepancy regarding his date last insured, allegedly the result of his having worked for a period of time under a different social security number. This argument, however, was not fully developed and will be disregarded. *See United States v. Brown*, 899 F.2d 677, 679 (7th Cir.1990) ("[I]t is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel."). Furthermore, as stated above, Plaintiff was invited to clear up the discrepancy, but he did not produce the requested records and/or releases.

conflict between the VE's testimony and the DOT, so any such error would be harmless. *See id.*

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment or Remand [Doc. No. 18] is granted in part and denied in part and Defendant's Motion for Summary Judgment [Doc. No. 27] is denied. The matter is remanded to the Commissioner for further proceedings consistent with this opinion.

**SO ORDERED.**

**ENTERED:**

DATE:     **July 7, 2011**

**HON. MARIA VALDEZ**